IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**RENEE and STEVE GARCIA,** *et al.***,**

   Plaintiffs,

v.                                                                           Case No. 20-cv-01006-MIS-JHR

**AIMS at UNM, a public charter school,**

   Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION DENYING PLAINTIFFS' MOTION FOR JUDGMENT ON THE RECORD AND UPHOLDING THE HEARING OFFICER'S DECISION

THIS MATTER comes before the me pursuant to a Motion for Judgment on the Record and Memorandum of Law in Support by Renee and Steve Garcia ("Plaintiffs"), individually and on behalf their minor child R.G. [Docs. 18, 18-1]. Plaintiffs appeal the decision of the due process hearing officer ("DPHO") who found in Plaintiffs' favor and determined that AIMS failed to provide a free appropriate public education ("FAPE") pursuant to the Individuals with Disabilities Education Act ("IDEA"). *See* [Doc. 17-4]; 20 U.S.C. § 1400 *et seq*. Plaintiffs appeal the DPHO's denial of a compensatory education remedy in the form of twice weekly tutoring in organization and time management for one school year. *See* [Docs. 18-1, 30]. United States District Judge Margaret I. Strickland referred this matter to me for analysis and proposed findings and disposition. [Doc. 24]. Having reviewed the parties' submissions, the record, and the applicable law, I find that the DPHO correctly denied compensatory education. Accordingly, I recommend that the Court **DENY** Plaintiffs' Motion [Doc. 18] and **AFFIRM** the Due Process Hearing Officer's Memorandum Decision and Order. [Docs. 17-4 —17-6].

1

## BACKGROUND[1]

The focus of this case is a child, R.G., who was a student at Albuquerque Institute for Mathematics and Science at UNM, referred to as AIMS ("Defendant"), during the relevant time frame. [Doc. 27]. R.G. attended AIMS starting his sixth-grade year in August 2017 and has since withdrawn. [Doc. 12] at 3; [Doc. 17-5] at 19. The statutory period in this case is 2017 through 2020, R.G.s sixth, seventh, and eighth grade years. [Doc. 17-5] at 19.

R.G. attended middle school at AIMS, a well-regarded and ranked public charter school. *Id.* at 20-21. He did not have an individualized education plan ("IEP") when he started. *Id.* at 20. During sixth-grade, R.G. had general anxiety disorder, an episode of moderate major depression, Asperger's Type, and moderate ADHD-CT, but not bipolar disorder yet. *Id.* at 21-22. R.G. passed his sixth-grade classes and, although socially stunted, did not display too much stress. *Id.* at 23. A Comprehensive Diagnostic Evaluation performed the summer after sixth grade concluded that R.G. had Autism Spectrum Disorder and needed support with social skills/communication and repetitive behaviors. *Id.* at 23-24.

Before seventh grade started, Plaintiffs and Dr. E. (AIMS special education director) met to discuss R.G.'s diagnoses, further evaluation, and an IEP. *Id.* at 26-27. In October of seventh grade, R.G.'s teachers reported that he demonstrated emotional and social-isolation issues. *Id.* at 29-32. He also worked slower and had poorer focus, interest, and attention than his peers. *Id.* However, R.G.'s mood and academic performance remained stable from October to February. *Id.* at 33. In February, R.G.'s mother requested another meeting and followed up on a prior requested

---

[1] I will not recite all facts and findings, but only those relevant to the issue on appeal. The facts are drawn from the DPHO's Memorandum Decision and Order, which are *prima facie* correct and not contested.

2

evaluation that had not happened. *Id.* At this meeting, R.G.'s teachers reported that classroom interventions (like extra time) seemed to help and discussed R.G.'s negative self-perception. *Id.* at 35. In April, a Multidisciplinary Reevaluation Report recommended that R.G. undergo several evaluations for his social behavior, emotional concerns, oral expression, listening comprehension, and pragmatic language. *Id.* at 36. R.G.'s therapist noted that the testing suggested he should work on socializing and language pragmatics. *Id.* at 37.

The first IEP occurred on May 9, 2019. *Id.* at 38. The IEP reflected R.G.'s "primary exceptionality" as Autism with "communication, self-advocacy, social skills, [and] presentations being areas of concern." *Id.* at 38-39. The resulting accommodations included additional time and quiet space, restructuring projects in "chunks" to assist organization and schema, and peer involvement. *Id.* at 39. R.G. would also receive one hour per week of special education for one year, but not an extended school year *Id.* at 40. R.G.'s parents requested a myriad of other services and assessments, which the IEP did not address:

> [S]peech and language and social work evaluations, social work services, organization and time management skills (executive functioning skills), support in math, social skills training, [attendance at a] private Applied Behavioral Analysis (ABA) training, peer mentoring, a social/emotional goal, weekly progress reports, hard copies of textbooks for home, extra time to alleviate anxiety, that [R.G.] be allowed to make up assignments missed due to excused absences for attending doctors' appointments, and for a place for [R.G.] to go if he had a meltdown to calm himself down, even allowance to go to the bathroom for that reason.

*Id.* To improve organization, R.G.'s therapist suggested a private summer academy. *Id.* Per the therapist, R.G's mood and academic performance (including work completion) remained stable during the summer academy. *Id.* at 43-44. Notably, Plaintiffs did not present evidence that a summer program was necessary for a provision of FAPE. *Id.*

R.G.'s mood and homework completion were generally positive at the beginning of eighth grade (August 2019). *Id.* at 44. STEM class excited him and so he excelled in it, but he did not like math. *Id.* His mother requested another IEP due to medication changes. *Id.* at 45. This second, more detailed IEP, issued September 4, 2019, also reflected R.G.'s Autism but did not find any special oral communication needs. *Id.* In this IEP, R.G.'s strengths were his diligence, conscientiousness, and intelligence, noting that he is "very responsible and turns in good quality work," "pays attention well, on task," and "has the ability to remain focused on the task at hand, reading comprehension and skills." *Id.* at 45-46. His needs again included pragmatics of language and self-advocacy skills, specifically needing to be more engaged and ask more questions *Id.* Other concerns were effective time management, remaining focused, and completing assignments after absences. *Id.* at 46. The prescribed accommodations included preferential seating, additional time, quiet space, and instructional materials for home. *Id.* Projects were still to be structured in chunks in order to develop organization and schema. *Id.* The IEP objectives to accomplish academic goals involved engaging in class and social discussions "by posing and responding to questions." *Id.* at 47. R.G. was to receive three hours per week of special education but no extended school year. *Id.* R.G.'s parents again made additional requests not documented in the September IEP:

> [F]urther evaluation for speech, social work, (SBA-interpreted as ABA) sensory, functioning skills in organization and time management, a social/emotional goal, support in math, textbooks for home, the peer mentor reviews, a request for all teachers to be provided with the IEP, and a safe spot.

*Id.* at 49. R.G. remained stable, completed his assignments, and made progress with schoolwork from September to October of eighth grade. *Id.* at 50.

In October, his mother requested another IEP to address teachers not following the September IEP as well as R.G.'s poor grades and social/emotional needs. *Id.* at 51. The IEP was

4

set for November 12, 2019, with a pre-IEP meeting on November 8. *Id.* at 52-53. However, because of a misunderstanding, the IEP meeting did not happen and was never rescheduled. *Id.* at 53-54. At his mother's prompting, accommodations again provided R.G. a quiet place to work without being timed. *Id.*

R.G.'s condition worsened around Thanksgiving. *Id.* at 56. He had a panic attack at school and could not do his homework over Thanksgiving. *Id.* His mood was depressed and flat. *Id.* His therapist recommended he stay home for the rest of the semester to stabilize his mood and cognition with medication changes. *Id.* R.G.'s mother requested an emergency IEP to request homebound services, but that IEP never took place. *Id.* at 57. Although AIMS could not provide homebound services, the teachers created educational packets for R.G. to take home. *Id.*

The fall semester of R.G.'s eighth-grade year ended with mixed results. R.G. did well in subjects that interested him, such as STEM class where he did not need all accommodations. *Id.* at 58. However, he struggled in subjects like math which did not interest him. *Id.* at 55, 59. The math teacher gave R.G. more time and instruction, required him to complete only 50% of an assignment, which he broke down into smaller chunks, and let R.G. take the final exam in a quiet place with unlimited time. *Id.* at 55. He also stood next to R.G. during assignments to keep him on task. *Id.* at 59. The math teacher concluded R.G.'s bad math grade showed lack of motivation and diligence. *Id.* R.G. briefly returned for the spring semester before the COVID-19 pandemic. *Id.* at 59. R.G.'s academic performance greatly improved with online classes during the pandemic. *Id.* In fact, he was "outstanding" and a top performer in remote schooling. *Id.*

R.G.'s parents filed their Request for Due Process on January 27, 2020, which triggered a "stay-put." *Id.* at 60. The speech language evaluation was redrafted after the "stay-put." *Id.* The

evaluator concluded that R.G. did not have a language disorder regarding receptive, expressive, or pragmatic/social language skills. *Id.* However, she noted that he may still struggle with social communication and self-advocacy and suggested monitoring his nonverbal communications, depression, anxiety, and self-esteem. *Id.* Private expert Dr. A.H. evaluated R.G. again in March 2020 to prepare to testify at the Due Process Hearing. *Id.* at 61. Dr. A.H. recommended that AIMS staff receive autism training (a request which Plaintiffs have since withdrawn), and that evaluations and services in social work, speech-language, occupational therapy, functional behavior, and applied behavior be provided outside of school but with a shortened school schedule to allow for therapy during school hours. *Id.* at 61.

## DPHO's Findings

Based on these facts, the DPHO found eleven (11) substantive violations of FAPE: (1) August 6, 2018 through October 17, 2018 Failure to Timely Evaluate; (2) February 26, 2019 Failure to Timely Evaluate; (3) May 9, 2019 IEP—Present levels of Academic Achievement and Functional Performance; (4) May 9, 2019 and September 4, 2019 IEPs—Special Education Services; (5) May 9, 2019 IEP—Frequency, Location, and Duration of Services; (6) September 4, 2019 IEP—Frequency, Location, and Duration of Services; (7) May 9, 2019 and September 4, 2019 IEPs—11 Considerations of Autism; (8) May 9, 2019 and September 4, 2019 IEPs—Inappropriate Plans; (9) May 9, 2019 and September 4, 2019 IEPs—Prior Written Notice; (10) September 4, 2019 IEP—Predetermination; and (11) May 9, 2019 and September 4, 2019 IEPs—Implementation. [Doc. 17-6] at 7.

Plaintiffs requested a plethora of remedies for these violations. *Id.* at 8-13. The DPHO granted Plaintiffs' a sensory processing and social skills processing evaluation (including an

evaluation in social work), a functional behavior assessment, a release from classes for private ABA therapy sessions during school days, and that the next IEP be facilitated by the New Mexico Public Education Department (due to breakdown in the parties' communications). *Id.* at 7-13. In relevant part, the DPHO denied the equitable requests for compensatory education in the form of twice weekly tutoring in organization and work completion for one year, and compensatory training in the form of Autism and IDEA training for AIMS staff. *Id.* at 8, 9, 11-13.

Regarding compensatory education denial, the DPHO reasoned that Plaintiffs had not met their burden of showing specific loss and how to compensate for this loss to return R.G. to where he would have been absent the FAPE violations. *Id.* at 11. The DPHO determined that Plaintiffs had not presented the required evidence for an accounting or other explanation to connect a compensatory education to past FAPE violations. *Id.* at 8, 11.

Plaintiffs filed their Complaint for Judicial Review on October 2, 2020. [Doc. 1]. Plaintiffs appealed only the denials of compensatory tutoring and staff training. *See id.* After Plaintiffs advised that R.G. had withdrawn from AIMS [Doc. 27], I ordered supplemental briefing on whether his withdrawal rendered the request for staff training moot since R.G. no longer attended the school. [Doc. 29]. Plaintiffs thereafter voluntarily withdrew their request for compensatory staff training, conceding that R.G. was unlikely to return to AIMS. [Doc. 30]. Thus, the only remaining issue on appeal is the request for compensatory tutoring.

## ISSUE PRESENTED

Did the DPHO err by declining to award R.G. compensatory education─ in the form of twice weekly tutoring in the areas of organization and work completion─ when there is no specific

indication in the record that R.G. should have received that service under a timely and fully supported IEP and where the DPHO awarded other remedies for R.G. to address his disabilities?

## **LEGAL STANDARDS**

Congress enacted the IDEA to ensure that all children with disabilities receive a free appropriate public school education. *Albuquerque Pub. Sch. Bd. of Educ. v. Armstrong*, No. 1:21-CV-00396 WJ-JHR, 2021 WL 5881996, at *2 (D.N.M. Dec. 13, 2021), *aff'd*, No. 22-2012, 2022 WL 17576355 (10th Cir. Dec. 12, 2022) (citing 20 U.S.C. § 1400(d)(1)(A)). The IDEA allows parents an impartial due process hearing if they allege that a school district fails to provide their student a FAPE. *Id.* Appeals from state agency decisions may be filed in a state or district court within ninety days of the DPHO's decision. *Id.*

A district court applies a modified *de novo* standard when reviewing an administrative decision in the IDEA context. *Preciado v. Bd. of Educ. of Clovis Mun. Sch.*, 443 F. Supp. 3d 1289, 1297 (D.N.M. 2020) (citing *Garcia v. Bd. of Educ. of Albuquerque Pub. Sch.*, 520 F.3d 1116, 1125 (10th Cir. 2008)). This means that the district court must give "due weight" to the findings in the administrative proceeding and consider the DPHO's factual findings *prima facie* correct. *Id.* (internal citation omitted). The burden of proof is on the party seeking relief. *See Armstrong*, 2021 WL 5881996, at *2 (internal citation omitted).

A DPHO or court may fashion equitable relief following an IDEA violation. *Id.* (citing *Garcia*, 520 F.3d at 1128). A district court has "broad discretion in determining relief for successful IDEA claims," including awarding or withholding equitable remedies so long as a valid basis in equity exists. *Garcia*, 520 F.3d at 1128. Compensatory education is a form of equitable relief. *Preciado*, 443 F. Supp. 3d at 1296. The compensatory education inquiry must be "fact

specific" and "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Reid ex rel. Reid v. District of Columbia,* 401 F.3d at 516, 523–24 (D.C. Cir. 2005). Compensatory awards must do more than provide "some benefit"; they must in fact compensate. *Id.* at 525 (comparing the lower IEP standard of providing "some benefit" to the student).

## ANALYSIS

My task is to review the DPHO's decision under the modified *de novo* standard giving due weight to the administrative findings. Plaintiffs remaining challenge is to the denial of twice weekly tutoring in organization and work completion for one school year. *See* [Docs. 18-1, 27]. Plaintiffs contend that the DPHO erred "by refusing to craft equitable relief." [Doc. 18-1] at 17. They assert that the DPHO's "rigid approach is not equitable, is unsupported by a fact-specific inquiry, does not have a valid basis in equity, and therefore constitutes an abuse of discretion." *Id.* They point to the overall time frame of the substantive violations as necessitating year of tutoring. *See id.* at 16-18. Defendant counters that the Plaintiffs have not met their burden of showing that the requested twice weekly tutoring would in fact would serve as a replacement for previously lacking services, i.e., that it was compensatory in nature. [Doc. 19] at 14, 15. Defendant urges that there is "no logical link between the tutoring requested and a remedy [for] the deficiencies in the IEPs." *Id.* at 17. The remedies that the DPHO awarded, Defendant asserts, properly address R.G.'s unique, individualized needs. *Id.* at 18. Both parties analyze the DPHO's findings of substantive FAPE violations to support their arguments.

I note that R.G.'s case presents a complex set of facts involving multiple years, multiple behavioral and mood disorders, multiple medication adjustments, multiple academic issues, and

9

multiple IEPs. However, the focus of this appeal is narrow: whether the DPHO should have awarded compensatory education. Thus, my inquiry is whether Plaintiffs have shown that a school year of twice weekly tutoring in time management and organization is reasonably calculated to provide R.G. with the educational benefits he should have received had AIMS provided him with appropriate services. *See Reid*, 401 F.3d at 516. I find that Plaintiffs have not made that showing and recommend denying their Motion.

**A. The IEPs do not support compensatory education.**

The IEPs do not support compensatory tutoring because R.G. was not deprived of time management and organizational services to a degree that requires compensatory education.[2] The DPHO found that R.G.'s seventh and eighth grade IEPs primarily addressed his deficiencies in communicating, social skills, and self-advocacy. [Doc. 17-5] at 38-39, 45. The third IEP request also arose from social/emotional needs. *Id.* at 51. The IEPs address R.G.'s organization challenges in the context of modifying "instructional presentation." They specified that projects were to be reduced to manageable "chunks" so that R.G could organically develop organization skills. *Id.* at 38-39, 45. However, instructional presentation is hardly the thrust of the IEPs.

Plaintiffs' pursuit of additional organization and time management services in the IEPs was one of many requests. *Id.* at 42, 49 (including assessments and/or services for speech, social work, sensory processing, social/emotional goals, math support, home textbooks, peer mentor reviews, teacher awareness of IEPs, and a safe space). There is little doubt that the deprivation of

---

[2] I have reviewed the administrative record provided on January 20, 2021, applying the modified *de novo* standard. [Docs. 17─17-25]. This review includes the email correspondences, IEPs, evaluations and/or assessments, school assignments, and therapy records, among other documents. While I do not refer specifically to the attachments, I find that the DPHO's findings of fact appropriately incorporated these records. Therefore, citations to the DPHO's decision also consider the documents from which they were drawn.

appropriate seventh and eighth grade IEPs caused R.G. to lose some benefits he would have received in organization and time management from modified instructional presentation. However, the degree and nature of loss does not support compensation through twice weekly tutoring for a school year.[3]

**B. The DHPO's reasoning denying compensatory education is meritorious.**

The DPHO determined that Plaintiffs failed to sufficiently tie the compensatory tutoring to past violations. [Doc. 17-6] at 8. She reasoned that Plaintiffs "have not proved … what is needed to compensate for the loss to put [R.G.] back in the place he would have been absent substantive violations, considering [R.G.'s] ongoing needs." *Id.* I agree.

The DPHO relied on the *Meza* and *Reid* cases in concluding that Plaintiffs needed an accounting or other explanation to support compensatory education. *See Meza v. Bd. of Educ. of the Portales Mun. Sch.*, No. CIV.10-0963-JB/WPL, 2011 WL 1128876, at *1 (D.N.M. Feb. 25, 2011); *Reid*, 401 F.3d at 516. Those cases reject the "mechanical hour counting" that treats compensatory education as a "form of damages—a charge on school districts." *Meza*, 2011 WL 1128876, at *16; *see Reid*, 401 F.3d at 524. *Meza* relied on *Reid* in rejecting the hearing officer's compensatory education award of one year with consultant team assistance because the hearing officer failed to explain through an accounting or other mechanism why she chose that length of

---

[3]The two additional IEPs that R.G.'s mother requested (and which never materialized) also would not support compensatory education. First, in October 2019 (one month after the implemented September IEP), she requested an IEP to address RG's social/emotional needs and the prior IEP not being implemented. *Id.* at 51, 53. Second, she requested an emergency IEP due to R.G.'s panic attack and failing grades around Thanksgiving. *Id.* at 56. R.G.'s motivation and interest in classes is another element cutting against compensatory relief. R.G. was failing math but excelled at STEM class. *Id.* at 41, 55, 59. The math teacher finally concluded R.G. lacked motivation in math after he provided multiple accommodations and helped R.G. stay on task. *Id.* at 55, 59.

11

time. *Meza*, 2011 WL 1128876, at *17 (finding that the hearing officer did not tie her order for compensatory education to the record in the preliminary injunction context). The court was "unclear if the [hearing officer] was relying on some [prohibited] formulaic hour counting or attempting to craft an award compensating past violations relying on an individualized assessment." *Id.* (internal citation and quotation omitted).

Plaintiffs try to distinguish *Meza* by pointing out that it was the hearing officer—not the parents— who failed to provide an accounting supporting compensatory relief. [Doc. 18-1] at 17. They urge that *Meza* "does not grant permission for a DPHO to abandon the obligation" to craft fact-specific equitable relief. *Id.* at 17. Plaintiffs' arguments are misplaced. I agree that *Meza* does not give free rein to abandon any equitable relief. However, I disagree with Plaintiffs' implication that it is the strictly the hearing officer's or court's job, not the movant's, to provide individualized reasons (through an accounting or otherwise) for a compensatory award.[4] Plaintiffs' conclusory arguments reciting the FAPE violations fail to furnish any specific nexus or "logical link" between the violations and what education R.G. should have received in the first place. *See* [Doc. 18-1] at 8-12; [Doc. 19] at 17, 20; *see Meza*, 2011 WL 1128876, at *16. This is fatal to Plaintiffs' request for compensatory education.

### C. R.G.'s therapy records do not support compensatory education.

The therapy records reflect that R.G. is intelligent, creative, and funny but he initially resisted accepting his diagnoses for bipolar and autism disorders. *See* [Doc. 17-18] at 12, 24; [Doc. 17-20] at 12; [Doc. 17-21] at 1-7. Even after accepting his diagnoses, he resisted alerting his

---

[4] Defendant identifies Plaintiffs' subtle burden shifting in this regard: "Plaintiffs bore the burden to show how the remedies Plaintiffs sought were reasonably calculated to provide the educational benefits that would have accrued from special education services the school district should have supplied in the first place. [Doc. 19] at 13 (citing *Reid*, 401 F.3d at 526).

12

teachers to his conditions and needs because he did not want to stand out. [Doc. 17-21] at 1. Not voicing his misunderstandings and misinterpretations surrounding schoolwork contributed to R.G. becoming overwhelmed and falling behind in class. *Id.*; [Doc. 17-20] at 12, 14.

    R.G.'s organization issues arose in therapy when R.G.'s mother pondered how to make R.G. less reliant on her and others for organization. *See* [Doc. 17-19] at 22 (therapist recommending summer program for organization); [Doc. 17-20] at 12 ("R.G.'s mother struggles with how much to do for him" and states he "has difficulty communicating his needs to his teachers"); *Id.* at 14 ("We discussed the issue of his mother not knowing how much . . . she needs to insist that he do."). R.G.'s mother revealed that she had not reminded R.G.'s sister of work and let her feel the consequences, but it was harder to do this with R.G. *Id.* at 14. The therapist recommended that R.G. also be accountable for his actions and experience their consequences. [Doc. 17-20] at 14. She noted that R.G. had been excused from turning in all his assignments when he was younger, implying that this may contribute to his organizational struggles. *Id.*

    Holding R.G. accountable seemed to work. By the next therapy session, R.G. and his mother had "made an enormous amount of progress" in this regard, and R.G. completed all but one assignment. [Doc. 17-20] at 24. The therapist noted that "it was obvious [R.G] was trying" when his mother "knew that she needed to hold him accountable." *Id.* She observed that R.G.'s demeanor was "pleasant then sullen re: being held accountable for all work being turned in." *Id.* The DPHO also mentioned "accountability for not turning in assignments was stressed to be a therapeutic goal for education commencing on September 17, 2019, and into October 1, 2019, where [the therapist] noted [that R.G.] made progress with his schoolwork . . . and that he was able

to complete homework and talk to his teachers on [h]is own." [Doc. 17-5] at 50. Thus, the therapy records undercut Plaintiffs' position that R.G. requires compensatory tutoring to make him whole.

**D. Withholding compensatory education is appropriate in light of IDEA's purposes.**

The Tenth Circuit case *Garcia v. Board of Education of Albuquerque Public Schools* instructs courts on the propriety of a compensatory education award. *Garcia*, 520 F.3d at 1116. Judge Gorsuch outlined the district court's broad discretion in questions of remedy. *Id.* at 1128. A court may grant equitable relief to remedy a demonstrated IDEA violation or may "choose to withhold relief despite a demonstrated . . . statutory violation if it has a valid basis in equity for doing so." *Id.* (adding that the power to grant equitable relief "hardly suggests an absolute duty to do so under any and all circumstances."). In other words, a court "need only evaluate whether . . . a remedial decision is within the range of reasonable choices in seeking to achieve whichever of IDEA's purposes are implicated in a given case." *Id.* at 1129. The Tenth Circuit thus found that the district court's denial of compensatory education "fell well within the broad parameters of the [equitable] discretion Congress chose to invest in it." *Id.* at 1130-31 (noting that, despite finding no abuse of discretion, the Tenth Circuit may not have reached the same outcome).

Applying *Garcia* to the instant case, I find that it is proper and within the Court's broad equitable discretion to withhold compensatory education. Denying compensatory education here is appropriate considering the first, second, and fourth purposes of IDEA. The first purpose of IDEA is to provide all disabled children with FAPE that emphasizes special education and services designed to meet their unique needs. *Garcia*, at 1129. Here, the DPHO ordered sensory and social skills processing evaluations, a functional behavioral assessment, a release from classes to attend therapy sessions, and facilitation of the next IEP by the New Mexico Public Education Department.

[Doc. 17-6] at 10-13. These remedies are directly tailored to address R.G.'s unique needs including communication, social, and behavioral issues. The net effect of these remedies ensures R.G. has particularized services guaranteeing FAPE. The same cannot be said for compensatory tutoring, which aims at to correct a symptom of R.G.'s unique needs, not the needs themselves.

Denying equitable relief is proper considering IDEA's second purpose, to ensure that educators and parents have the necessary tools to improve disabled children's educational results. *Id.* at 1129. The evaluations ordered in R.G.'s specific areas of need are themselves tools for R.G.'s teachers and parents to improve his education. They will allow his parents and school to better understand what behavioral, emotional, or academic areas he needs the most help with and point to precise strategies to assist R.G.'s educational prospects. Compensatory education, meanwhile, employs too general a solution to a complex circumstance.

Finally, denying equitable relief is proper considering IDEA's fourth purpose, to assess and ensure that efforts to educate children with disabilities are effective. *Id.* The evaluations ordered target R.G.'s greatest demonstrated needs and isolate the exact skills or behaviors requiring urgent attention. This ensures that efforts to educate R.G. are effective rather than excessive. As discussed above, R.G.'s organization and time management issues are not the chief conditions holding him back at school. Rather, poor organization and time management derive from his inability to express thoughts and needs, ask questions, and clarify misunderstandings (among others). The remedies granted address these causes of R.G.'s academic issues. Once implemented, improvement in time management and organization should follow suit. Finally, considering the therapist's indication that R.G. can stay organized when held accountable, compensatory tutoring is duplicative and ineffective.

## CONCLUSION

For foregoing reasons, I find that a valid equitable basis exists for denying compensatory education and that denial is appropriate considering IDEA's purposes. The substantive FAPE violations caused by AIMS neglect in implementing and maintaining IEPs are concerning. However, the DPHO considered these violations and crafted appropriate remedies. While I believe that compensatory education would provide R.G. some benefit, it fails to make up for benefits R.G. should have received had the school consistently provided appropriate services.

Therefore, I **RECOMMEND** that the Court **DENY** Plaintiffs' Motion for Judgment on the Record [Doc. 18] and **AFFIRM** the DPHO's decision.

_____
JERRY H. RITTER
UNITED STATES MAGISTRATE JUDGE

> **THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed**